UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YUSUF SPARKS<br><br>　　　　Plaintiff,<br><br>　　　　-vs-<br><br>CORRECTIONS SERGEANT JASON HOLLAND;<br>CORRECTIONS SERGEANT WILLIAM LECLAIR;<br>CORRECTIONS LIEUTENANT SNOW;<br>CORRECTIONS OFFICER NICHOLAS MARTIN;<br>CORRECTIONS OFFICER PATRICK CLANCY;<br>CORRECTIONS OFFICER B. BARBER;<br>CORRECTIONS OFFICER CHAD STICKNEY:<br>CORRECTIONS OFFICER DUCAN; F.S.A. FRENCH;<br>NURSE KIMBERLY KIM; SUPERINTENDENT<br>MICHAEL KIRKPATRICK; CORRECTIONS<br>SERGEANT PATRICK STOTLER; CORRECTIONS<br>OFFICERS JOHN DOE 1-20.<br><br>　　　　Defendants. | Case No: 19-CV-1269<br>MAD/ATB<br><br><br>**SECOND AMENDED<br>COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Yusuf Sparks, by his counsel, P. Jenny Marashi, Esq., alleges with knowledge as to his own acts, status, and acts taking place in his presence, and upon information and belief as to all other matters, as follows:

## JURISDICTION

1.　　　This court has federal question jurisdiction under 28 U.S.C §§ 1331, 1343(a), (3), and (4).　Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of

the events or omissions that gave rise to this action took place within the Northern District of New York.

## JURY TRIAL DEMANDED

2.      Plaintiff demands trial by jury of all issues properly triable thereby.


## NATURE OF THE ACTION

3.      This is a civil action for damages and remedies brought pursuant to 42 U.S.C. § 1983 for violations of the Plaintiff Yusuf Sparks' First, Eighth, and Fourteenth Amendment rights under the United States Constitution, claims under 42 U.S.C. § 1985 and § 1986, as well as claims under the Americans with Disabilities Act.

4.      As described herein, Mr. Sparks, a 6 ft 6 inch tall practicing Muslim who is African-American, was on two separate dates (October 2016 and October 2018) subjected to, among other things, assault at the hands of Defendant Corrections Officers at Clinton Correctional Facility (hereinafter "Clinton"). Prior to these incidents, both he and his criminal defense attorney communicated via the chain of command to prison officials that he was going to be assaulted and that a weapon would be framed on him.  He was informed and provided with signed and notarized affidavits by other prisoners that they had been approached by Defendant Corrections Officers who asked them to fight Mr. Sparks and told them they would be rewarded for doing so. This highlights the deliberate indifference with which other employees of Clinton condoned and even encouraged Defendants Corrections Officers' actions, as well as the reckless negligence of the supervisors who condoned or recklessly disregarded their employees' assault of inmates and explicit approval and active promotion of inmate fighting.

5.      This case is also about an internal disciplinary system providing no due process or substantive investigation that sentenced Mr. Sparks, a young man with learning and mental health disabilities, to the cruel and barbaric punishment of solitary confinement for possessing a weapon, when it was in fact Plaintiff who was the sole victim of slashing -- an outcome which offends common sense and which is facially an evidentiary impossibility. It was Defendants who planted a weapon on Plaintiff, intentionally causing him to be charged and penalized administratively. As a result, Mr. Sparks was subjected to long-term solitary confinement, where he suffered mental anguish and a deprivation of privileges.

6.      Finally, this case is about what happens when the New York Department of Corrections and Community Supervision (herein after "DOCCS") does not reasonably accommodate inmates with mental health and learning disability diagnoses. Mr. Sparks was not equipped with the tools and resources to properly make his needs known. While Mr. Sparks sent numerous grievances and letters to prison officials, in fluctuating states of mental health exacerbated by his solitary confinement and the violence perpetrated on him by Defendant Officers. Prison officials, rather than investigating Mr. Sparks' documented claims, disregarded his pleas and labeled him as a "writ writer" who writes complaints regarding his treatment in prison. Writ writers are hated and retaliated against by Corrections Officers and administrators in the New York Department of Corrections and Community Supervision ("DOCCS"); they are referred to as "rats" and "snitches" whose complaints are not taken seriously. Defendants knew or should have known that telling other inmates that Plaintiff was a "rat," in a prison setting, would incite other inmates to attack Plaintiff.

## PARTIES INVOLVED

7.      Plaintiff Yusuf Sparks was an inmate on October 18, 2016 and October 25-27th, 2018 incarcerated in the custody of the State of New York Department of Corrections and Community Supervision (hereinafter "DOCCS") at Clinton Correctional Facility.  His Department Identification Number was 14A0340.  He is currently residing in Bronx, NY.

8.      Defendants, at all times relevant in this action, were employed by the New York State Department of Corrections and Community Supervision at the Clinton Correctional Facility. As a result, Defendants owed a duty of care, custody and control to Plaintiff, but instead acted under color of law to deprive Plaintiff of his Constitutional Rights.

9.      Defendant Holland was a Correctional Sergeant at Clinton Correctional Facility during the relevant time of the events that gave rise to this action; all of his actions or inactions were taken under color of state law. Upon information and belief, Sergeant Holland is a resident of New York. The claims against Officer Holland are brought against him in his individual capacity.

10.      Defendant Snow was a Correctional Sergeant at Clinton Correctional Facility during the relevant time of the events that gave rise to this action; all of his actions or inactions were taken under color of state law. Upon information and belief, Lieutenant Snow is a resident of New York. The claims against Defendant Snow are brought against him in his individual capacity.

11.      Defendant Nicholas Martin was a Corrections Officer at Clinton Correctional Facility during the relevant time of the events that gave rise to this action; all of his actions or inactions were taken under color of state law. Upon information and belief, Officer Martin is a

resident of New York.  The claims against Officer Martin are brought against him in his individual capacity.

12.     Defendant Patrick Clancy was a Corrections Officer at Clinton Correctional Facility during the relevant time of the events that gave rise to this action; all of his actions or inactions were taken under color of state law. Upon information and belief, Officer Clancy is a resident of New York. The claims against Officer Clancy are brought against him in his individual capacity.

13.     Defendant B. Barber was a Corrections Officer at Clinton Correctional Facility during the relevant time of the events that gave rise to this action; all of his actions or inactions were taken under color of state law. Upon information and belief, Officer Barber is a resident of New York. The claims against Officer Barber are brought against him in his individual capacity.

14.     Defendant Ducan was a Corrections Officer at Clinton Correctional Facility during the relevant time of the events that gave rise to these claims; all of his actions or inactions were taken under color of state law. Upon information and belief, Officer Ducan is a resident of New York. The claims against Officer Ducan are brought against him in his individual capacity.

15.     Defendant French was a hearing officer, who conducted the Tier III hearing for Plaintiff's October 16 charges, at Clinton Correctional Facility during the relevant time of the events that gave rise to these claims; all of his actions or inactions were taken under color of state law. Upon information and belief, Officer French is a resident of New York. The claims against Officer French are brought against him in his individual capacity.

16.      Defendant Kimberly Kim was a nurse at Clinton Correctional Facility during the relevant time of the events that gave rise to these claims; all of her actions or inactions were

taken under color of state law. Upon information and belief, Nurse Kimberly Kim is a resident of New York. The claims against Nurse Kim are brought against her in her individual capacity

17.     Defendant Sergeant LeClair was a Corrections Officer at Clinton Correctional Facility during the relevant time of the events that gave rise to these claims; all of his actions or inactions were taken under color of state law. Upon information and belief, Defendant LeClair is a resident of New York. The claims against Sergeant LeClair are brought against him in his individual capacity.

18.     Defendant Michael Kirkpatrick was the Superintendent of Clinton Correctional Facility during the relevant time of the events that gave rise to these claims; all of his actions or inactions were taken under color of state law. Upon information and belief, Defendant Kirkpatrick is a resident of New York. The claims against Superintendent Kirkpatrick are brought against him in his individual capacity.

19.     Defendant Chad Stickney was a Corrections Officer at Clinton Correctional Facility during the relevant time of the events that gave rise to these claims; all of his actions or inactions were taken under color of state law. Upon information and belief, Officer Stickney is a resident of New York. The claims against Officer Stickney are brought against him in his individual capacity.

20.     Sergeant Patrick Stotler was a Corrections Officer at Clinton Correctional Facility during the relevant time of the events that gave rise to these claims; all of his actions or inactions were taken under color of state law. Upon information and belief, Defendant Stotler is a resident of New York. The claims against Sergeant Stotler are brought against him in his individual capacity.

21.     Defendants Corrections Officers John Doe 1-20 are adult individuals who, during the relevant time of the event that gave rise to these claims, were employed by the New York Department of Corrections and Community Supervision. All of Defendants John Doe 1-20's actions or inactions were taken under color of state law. They are sued in their individual capacities.

## FACTUAL ALLEGATIONS

22.     Plaintiff Yusuf Sparks has been diagnosed with mental health issues and learning disabilities. His Department of Corrections and Community Supervision Office of Mental Health level is 2. He was on the Office of Mental Health caseload from February 19, 2015 to August 16, 2015, and from May 2, 2016 until his incarceration ended. He has been prescribed, and may still be prescribed, medication for depression and bipolar disorder. He received special education for his learning disabilities throughout his schooling, beginning with the 2nd grade. He also suffers from a traumatic brain injury that further reduced his functioning.

23.     According to OMH guidelines and regulations, OMH Service Level 2 offenders are those who need or may need psychiatric treatment for a major mental disorder and who require housing in a facility with full-time OMH staff.

24.     Prior to assignment to Clinton Correctional Facility, a maximum security prison operated by DOCCS in Dannemora, New York, Plaintiff knew he would be in danger there based on an incident that had occurred while Plaintiff was incarcerated at Great Meadow Correctional Facility, among other reasons. Despite letters from himself and his then criminal defense attorney, Mr. Andrew Dalack, to Acting Commissioner Annucci, Mr. Sparks' transfer to Clinton was processed.

25.    On July 5, 2016, Mr. Dalack received a letter from Anne Marie McGrath, Associate Commissioner, regarding his prior letter raising safety concerns concerning Mr. Sparks' transfer to Clinton. McGrath's response stated that Plaintiff's placement there was deemed appropriate at that time.

26.    Mr. Sparks had good reason to believe that Defendant Officers had been asking other inmates to "take a hit" on Mr. Sparks in late summer and early autumn of 2016. He was told, and provided signed affidavits from other inmates to his attorneys, that Defendant Officers, including the Officer referred to as "Captain America" whose back is tattooed with the image of an eye and who is believed to be Defendant Stickney, assured inmates that if they did "take the hit" on Mr. Sparks, they would go unpunished and the weapon would "disappear".

27.    On August 8, 2016, Mr. Sparks wrote a letter to Superintendent Kirkpatrick informing him that the Corrections Officer with a tattoo of an eye on his back, the Officer who is believed to be Defendant Stickney, called him offensive Muslim names and told Plaintiff that he hates Muslims and had thought about killing him a few times. He further stated that Defendant Stickney had been throwing out his Ramadan meals as well as giving them out to others, consequently starving him.

28.    On September 6, 2016, Defendant Stickney called Mr. Sparks a "rat" for writing the August 8, 2016 letter to Superintendent Kirkpatrick.

29.    In early September and October 2016, Mr. Sparks was told by several prisoners, and again provided signed affidavits from them, stating that they had been approached by Defendant Officers, including Clancy, and Snow, telling prisoners that if they take a hit on Sparks they would be provided with marijuana, be taken care of, and would be provided with protection.

30.     On September 15, 2016, Mr. Sparks wrote to Superintendent Kirkpatrick again, this time requesting Protective Custody because he feared for his life and had been informed that Defendant Corrections Officers were going to set him up.

31.     On September 17, 2016, Mr. Sparks wrote another letter requesting Protective Custody.  He stated that one of the Officers stated to him that "[his] boys work in Great Meadow [Correctional Facility] and will pay for what he did there".

32.      On September 26, 2016, Mr. Spark's then criminal defense attorney, Mr. Dalack, wrote to Superintendent Kirkpatrick, enclosing a letter from Yusuf stating that he was being denied protective custody, and fears his life is in danger. Mr. Dalack  requested that Kirkpatrick place Mr. Sparks in protective custody.

33.      On October 7, 2016, Mr. Mark Zeno, Assistant Attorney-in-Charge at the Center for Appellate Litigation, wrote to Superintendent Kirkpatrick, referencing Mr. Dalack's September 26, 2016 letter, and stating that on October 7, 2016, Mr. Sparks wrote Mr. Dalack again to tell him he was being denied protective custody by the corrections officers who were making Mr. Sparks sign rejecting protective custody.

34.      Mr. Zeno's letter to Kirkpatrick reiterated, "Superintendent Kirkpatrick, it is critical that you heed Mr. Sparks's wishes and place him in protective custody as soon as possible. He is scared of retaliation by your staff and fears being assaulted by other inmates. Please be aware that we are following Mr. Sparks's situation closely, and are very anxious about his well-being."

35.      On October 17, 2016, Mr. Sparks wrote a letter to prison officials stating that Defendant Clancy was going to set him up.

36.     On October 18, 2016, at approximately 10:45 A.M., Mr. Sparks' former criminal defense attorney, Andrew Dalack, called Clinton to speak to Superintendent Kirkpatrick in order to, again, let prison official know about the imminent threats against Mr. Sparks.  Mr. Dalack spoke to Superintendent Kirkpatrick's secretary, who referred him to the Sergeant of Security.  Mr. Dalack plead with them to conduct an investigation into Mr. Sparks' prospective placement in Protective Custody.

37.     It is believed that at some point between September to mid-October, Mr. Sparks was placed in an investigatory 72 hour keep lock status, at the direction of Superintendent Kirkpatrick.  Further, in that period of time, Mr. Sparks was forced to sign waivers for protective custody, by threat of Defendant Officers, even though he was asking for protective custody.

38.     Despite the credible threats to Mr. Sparks, he was released back into general population.

39.     Defendant Corrections Officers, including Stickney, Snow, and Clancy and their supervisors conspired with each other and with other inmates to threaten Mr. Sparks.  Never the less, Corrections Officers assisted in and affirmatively created the danger and allowing inmates to attack Mr. Sparks. Defendant Officers were conspiring and/or communicating that such actions directed towards plaintiffs would be accepted and tolerated.  These actions were taken against Mr. Sparks in retaliation for the many letters he had been writing, to his lawyers, and that they all had been writing about the conditions of his confinement, and the label they had given to Mr. Sparks as being a writ writer and a rat.

40.     It was as a direct result of Defendant's actions, and their telling inmates to "take a hit" on Plaintiff, and the meeting of the minds that existed between co-defendants and

inmates in their care and supervision, and their acting in concert to inflict an unconstitutional injury of plaintiff that Plaintiff was attacked on October 18, 2016.

41.     On October 18, 2016, at approximately 4:45 PM, Mr. Sparks was approached by two inmates in Clinton's North Yard. They punched and slashed him on the face and on his head by his hairline.

42.     Defendant LeClair responded to the Level 2 activation.

43.     This assault by other inmates should not have surprised prison officials, especially since Plaintiff and his attorney had written several letters to prison authorities requesting Plaintiff's placement in Protective Custody. Plaintiff's letters were written and sent long before he was attacked, but his repeated requests were ignored.

44.     In the letters he wrote prior to being attacked by two inmates, Plaintiff informed Defendant Kirkpatrick and other authorities that he had been threatened by Corrections Officers. According to his letters, those Officers said they were going to set him up.  Plaintiff also complained in his letters that the Officers were telling other inmates he was a "rat", and promising them privileges and a cover up, in an effort to incite those inmates to attack him.

45.     When he was attacked on October 18, 2016 in Clinton's North Yard, Plaintiff suffered considerable bleeding and lasting physical injuries.

46.     These injuries caused a lot of blood to come out of Mr. Sparks.

47.     While being transported in handcuffs by Defendant Officers, some blood accidently came on one of the Defendant Officers, who upon information and belief is Defendant Martin.

48.     Already disliked, and set up by Defendant Officers, Defendant Officers used this as an excuse to give Mr. Sparks a significant beating.

49.     Supervisor Defendant Holland told Mr. Sparks, in sub or substance, that he had spit on one of his officers and they have no idea what diseases he, a dirty n****r, has.

50.     Before Plaintiff was escorted to the prison's medical unit to treat his injuries, Defendants Holland, Martin, Clancy and Barber assaulted him in an area of the prison known as the "Rotunda." These Defendants also assaulted the Plaintiff inside of a room in the prison's medical unit. Defendants' attack caused further injuries to Plaintiff.

51.     Mr. Sparks suffered tremendous physical injury altogether based on the attacks: two lacerations on his face, swelling to the left side of his forehead, bruising and swelling around his eye, and abrasions on his legs and back.

52.     Defendants Clancy, Martin, Barber, and Holland maliciously and sadisticly, and for no reasonable purpose- all further participated in the attack by beating Plaintiff's body and the bottoms of his feet with a baton, and by kicking and punching the Plaintiff.

53.     As a Correctional Sergeant, Defendant Holland was responsible for supervising the other Defendant Corrections Officers. Sergeant Holland not only failed to stop the other Defendants from beating and attacking Plaintiff, he participated in those acts.

54.     Clinton's medical unit staff determined that Plaintiff's injuries were so severe that he required further treatment at an outside facility. As a result, Plaintiff was transported to Champlain Valley Physicians Hospital by state van for treatment.

55.     Defendants' repeated punches and hits with their batons to Plaintiff's legs, back, and feet caused Plaintiff to be confined to a wheelchair for several days.

56.     Following the North Yard incident, Corrections Officers reportedly searched the two attackers immediately after the incident, but failed to recover any weapons from either of them. Plaintiff states, upon information and belief, that Defendants protected the inmate attackers

from being charged in any disciplinary proceeding with causing Plaintiff's injuries or possessing a weapon, just as inmates had told Mr. Sparks- and provided signed affidavits- that they had been approached by Defendant Officers, including Snow, Stickney, and Clancy; and just as Mr. Sparks had predicted in his letters to supervisors, including Defendant Kirkpatrick.

57.     Defendant Clancy lied and stated that he found the weapon on Mr. Sparks front pocket after the attack on Mr. Sparks.

58.     Sergeant LeClair lied and reported that Mr. Sparks admitted to having the weapon and keeping it for protection.

59.     If Mr. Sparks had used the razor that he had for protection, he would have used it in the fight, but the evidence showed Mr. Sparks did not use a razor, but in fact, a razor was used on him.

60.     This purported finding of Defendant Clancy is incredible as the inmate attackers were not injured and the Plaintiff was the only person who sustained lacerations.  Defendants nonsensically claimed the weapon the other inmates used on the Plaintiff was found on Plaintiff.

61.     Of the two inmates who instigated and pursued the fight with Mr. Sparks, one did not have any injuries on his body whatsoever according to a report of the incident by Sergeant LeClair. The other, according to LeClair, had only a "¼' superficial laceration to his right 4th digit (ring finger)."

62.     Common sense logic and evidentiary standards demand the interpretation that if the only injury was to Mr. Sparks, who was covered with lacerations, and if there was no substantive injury to the other inmates except on the ring finger of one of their right hands, then that was likely the inmate who possessed the weapon and who perpetrated the slashing.

63.     This was exactly what Mr. Sparks had been told would happen.  This was exactly the thing that Mr. Sparks feared, as he had heard from inmates that they were being solicited by Defendant Officers to fight Mr. Sparks.  These things were done for various malicious reasons by Defendants, including, in retaliation for Mr. Spark's efforts to let his attorneys and prison officials know about the conduct of the Defendant Officers, and his protected speech for these activities.  This is why Mr. Sparks and his attorney had sent out multiple requests for protective custody before this incident occurred.  It was a snowball effect.  The more Mr. Sparks spoke out against his treatment, the more Defendant Officers tried to retaliate against him for such protected speech.

64.     Just as Mr. Sparks and his attorney had told prison officials, it was Mr. Sparks who was accused of having the weapon, who was found to have had the weapon, who Defendant LeClair stated told him he had the weapon.

65.     No proper investigation was conducted regarding the weapon, and Defendants all conspired together to ensure that Mr. Sparks would be punished and confined to the hell that is solitary confinement for an assault he never committed.  Each of the officers conspired together and with inmates to assault Mr. Sparks, and to frame the weapon on Mr. Sparks.

66.     Upon his return to Clinton approximately three days later, Mr. Sparks was sent to SHU.  This, despite the fact that Mr. Sparks had specifically requested Protective Custody.  This was done directly by Defendant Supervisor Officers Holland and Le Clair, and John Doe Officers who permitted such assignment without due process, amongst other reasons, in order to retaliate against Mr. Sparks for speaking out about his treatment by them and their officers, as well as to retaliate against Mr. Sparks for telling anyone, including his lawyers, about what was

going on with him.  Such punishment was also made to deter Mr. Sparks from speaking out in the future, both at his hearing, and also in any subsequent Court action.

67.     Mr. Sparks, even though he requested Protective Custody, was- without a hearing or any due process consideration- placed into Solitary Confinement.  He should have been placed in protective custody, not immediately placed in solitary confinement without any hearing.  When he was eventually afforded a hearing, it was a sham hearing, and it was while he was in solitary confinement, having already deteriorated mentally.

68.     As direct result of Defendants conspiring together and framing Mr. Sparks, and of their deliberate indifference to his safety and well being, Plaintiff was found guilty of possessing the razor-type weapon that injured no one but him and was sentenced to 450 days (from November 22, 2016 to February 15, 2018).

69.     450 days of SHU is an atypical and significant punishment, invoking due process considerations.

70.     Given Mr. Sparks learning disabilities, mental health status, and his confinement to SHU, among other factors, Mr. Sparks should have received a "substitute counsel" or "assistant".  Mr. Sparks was not substantively permitted either.

71.     While witnesses were permitted at the hearing, the witnesses consisted of the very officers who had violated Mr. Spark's constitutional rights, and set up Mr. Sparks- the Defendant corrections officers themselves, and Defendant French reading their reports.  Mr. Sparks' was not permitted to question, or speak directly to Defendant officers.

72.     The hearing officer, Defendant French, did not permit any evidence that was in support of Mr. Sparks' claim, this included, Mr. Sparks' introducing evidence about his prior concerns about the attack and weapons set up with Defendant Snow, Mr. Sparks attempting to offer

evidence about the other inmates and their lack of injuries. There were no meaningful due process procedures utilized by Defendant French.  No evidence is support of Mr. Sparks' position was permitted by Defendant French.

73.     Defendant French was not a fair hearing officer, and the hearing did not provide Mr. Sparks a reasonable opportunity to call witnesses, or present documentary evidence, as he was denied such.

74.     While in solitary confinement, Mr. Sparks, who had been previously diagnosed with mental illness, despite numerous calls for help in the form of letters from himself and Mr. Dalack to prison officials, exacerbated by being beaten by other inmates, Defendant officers, and framed with a weapon that would keep him confined to solitary confinement, a sham Tier III hearing, was traumatized.  He began to mentally deteriorate, and suffered from disturbing, and at times incoherent thoughts. These symptoms were a direct result of his punishment for the weapon framed on him.  Mr. Sparks has learning and mental health disabilities and should never have been placed in solitary confinement.  Such placement was an atypical and significant hardship.  It was a violation of the constitution, and should never be allowed in a civilized society.  It resulted in great damage to Mr. Sparks.

75.     As a result of Defendants' actions, six days after being attacked by Defendants and inmates at Defendant Corrections Officers' behest, Mr. Sparks in an attempt to escape the hell he was in, attempted suicide by swallowing a nail clipper and pills on October 24, 2016. He was taken the hospital and treated. Upon his return he was sentenced to an additional 180 days (from February 15, 2018 to August 15, 2018) for his attempted suicide at the Special Housing Unit.

76.     It should have become clear to the Officers who were interacting with Mr. Sparks that he, after having spent over a month in SHU, and a suicide attempt, was deteriorating mentally.  He could no longer identify himself at the Tier III hearing conducted by Defendant French.  Mr. Sparks began to identify himself as another person "Jackson" during the last hearing dates, continuing into late November 2016, one month after the October 18, 2016 incident.  Still, Mr. Sparks was not permitted a substitute counsel, or assistant, during his disciplinary hearing.

77.  Defendant French, despite seeing that Mr. Sparks could no longer identify himself continued the recorded sham hearings, often no more than a couple minutes long, without any evidence or any contrary finding on the record.

78.     Mr. Sparks whose mental health was deteriorating, was not being treated, but was being further punished in a Machiavellian nightmare consisting of stronger punishments, more confinements, and disciplinary hearings he did not have the ability to adequately represent himself in.

79.     Defendant Kirkpatrick had notice of the hearing, and of the allegations against Sparks.  However, even though he was the Superintendent and one of its mentally ill prisoners was subjected to abuse at the hands of his officers, and a sham hearing- where Mr. Sparks was denied representation, and denied any opportunity to offer conflicting representation, and the evidence, was prima facie, that Mr. Sparks did not cut anybody, Superintendent Kirkpatrick took no action to safeguard Mr. Spark's due process rights.

80.     Superintendent Kirkpatrick permitted the unconstitutional solitary confinement of a mentally ill and learning disabled prisoner.

81.     Defendant Officers, through their cruel acts, and through the solitary confinement, were able to "gaslight" Mr. Sparks, who was already mentally fragile-including telling him they would kill him, putting glass in his food, and other acts.  Mr. Sparks began to file numerous grievances, that were either intercepted by Defendants, or that resulted in him being discredited and his version of events discounted.

82.     What was clear during the torment to Mr. Sparks, is that Defendants began to demonize and dehumanize Mr. Sparks.  They no longer saw him as anything more than a "rat", a "writ writer" and trouble maker, an inmate with a disciplinary history, who they were going to punish.

83.     While in the SHU, in on or around November 29, 2016 it is believed that Mr. Sparks was forced to ingest the incorrect medication by Defendant Kimberly Kim, and that she told him that she hopes he dies.  She then made allegations against him, that he took the wrong medication. On November 30, 2016 Plaintiff was again forced to another sham hearing with no due process, and again sentenced to solitary confinement.  This time an additional 180 days (810 days total).  The punishment to Mr. Sparks was so egregious and unprecedented, that after being repeatedly charged with additional SHU time, it was modified by Donald Venuttozzi, Director of Special Housing. For the first time, somebody seemed to notice that that nature of the offense did not warrant the penalty imposed.

84.     Some time after the torture Mr. Sparks had to endure at the hands of Defendants, he was transferred out of Clinton Correctional Facility.


October 2018 Incident

85.     However, and surprisingly, on or about October 14, 2018, around the time Plaintiff had completed his solitary and keep lock time, and back in general population, Plaintiff was returned to Clinton.

86.     When the Plaintiff arrived back at Clinton, he was assaulted by it is believed to be Defendant Ducan.  The Officer grabbed him by the neck, and whispered the following in Plaintiff's ear: "We're going to kill you this time, you fucking nigger."  With the Plaintiff in mechanical restraints, the Officer then started punching the Plaintiff in his back and ribs.  The Officer also slapped the Plaintiff in his face several times.

87.     Plaintiff was interviewed by Sergeant Patrick Stotler, told Defendant Stotler that he had been attacked by, it was believed Defendant Ducan, and about Mr. Sparks' prior incidents at Clinton, and that he did not want to return to the same area, with the same Officers, and was requesting to be put in protective custody.  Plaintiff was told that he would not be getting protective custody, and to "take his problems to the yard".

88.     Defendant B. Barber, one of the same defendants referred to from the attack on October 18, 2016, announced to inmates on Lower-F housing unit at Clinton that the Plaintiff was a "rat" and that he was housed in cell 6.  That announcement occurred on October 23, 2018. As a Corrections Officer, the defendant owed due care to the Plaintiff, and the defendant should have known that his announcement jeopardized the Plaintiff's safety and security.

89.     Once again, inmates approached Sparks telling him that they had been approached by Defendant Officers, again, these inmates, as the inmates from October 2016, told Plaintiff that they had been told to attack Mr. Sparks, and that they would be awarded, and they would not be charged, or they will "beat their ticket".

90.     Defendant Officers took other actions, including searching Mr. Spark's neighbor's cells and inciting his neighbors to fight Plaintiff.

91.     Plaintiff feared for his life once again, and wrote several letters stating such and requesting to be put in protective custody.

92.     Once again, as accurately predicted by Mr. Sparks, Defendants based on their announcements incited other inmates to attack the Plaintiff on October 25, 2018, while he was in the bathhouse.  Plaintiff suffered injury.

93.      On October 26, Mr. Sparks reported the attack to mental health staff Ms. Emery who told Mr. Sparks there was nothing she could do.

94.     On October 27, 2018, Plaintiff was attacked again by other inmates at Clinton. Upon information and belief, the inmates were also incited by Defendant's announcement to attack him.

95.      Plaintiff was assaulted by four inmates on the way back from the cafeteria on the L4 company. Plaintiff was injured.

96.     None of Plaintiff's injuries were noted and Defendant Holland told the nurse that Plaintiff was fine and had no injuries in order to deprive him of medical attention, and to cover up Defendant Officer's actions.

97.     Defendant Holland then slapped the Plaintiff's face and threatened him while the Plaintiff was inside of a medical room for treatment from attacks by the inmates.

98.     Mr. Sparks was again, as was systematic at Clinton, placed on keep-lock for 30 days.

99.     After 30 days in keep-lock, Mr. Sparks was again assaulted by an inmate, this time in the mess hall.

100.    Again, Mr. Sparks pleaded with Defendant Stotler, Mr. Sparks told him about the three attacks, how inmates had been incited by Defendant Corrections Officers,  Mr. Sparks again conveyed his fear for his safety, and again he was denied Protective Custody.  Even though Mr. Sparks wanted Protective custody, Defendant Stotler stated, and wrote, that Mr. Sparks refused protection.

101.    Each of the defendants owed a duty to the Plaintiff to protect the Plaintiff from harm, and not to inflict harm upon him.  The defendants chose to dehumanize Mr. Sparks, breaching their duties, and violating the Plaintiff's constitutional rights as explained herein.

## CLAIMS FOR THE OCTOBER 2016 INCIDENT

### FIRST CLAIM AGAINST DEFENDANTS CLANCY, MARTIN, BARBER, AND HOLLAND
### Eighth Amendment, Cruel and Unusual Punishment (pursuant to 42 U.S.C. 1983 (Excessive Force)

107.   Above paragraphs are stated herein by reference.

108.   The actions of Defendants Clancy, Martin, Barber, and Holland in physically abusing Plaintiff violated the Eighth Amendment to the U.S. Constitution prohibiting cruel and unusual punishment.

109.   The misconduct of Defendants Clancy, Martin, Barber, and Holland was under color of state law by state actors, within the course and scope of their employment, making Defendants liable to Plaintiff under 42 U.S.C. § 1983.

110.   The force used by Defendants Clancy, Martin, Barber, and Holland was inflicted as intentional and gratuitous punishment, used for the purpose of punishing plaintiff, and

exceeded that which was reasonable and necessary under the circumstances, violated universally accepted standards of decency, and amounted to cruel and unusual punishment.

111.   The force used by Defendants Clancy, Martin, Barber, and Holland was malicious, sadistic with an intent to cause harm to Plaintiff.

112. As a direct and proximate cause of Defendants Clancy, Martin, Barber, and Holland's actions, Plaintiff suffered emotional and physical torture, severe injury, and trauma; immense pain and suffering; humiliation; and terror.

**SECOND CLAIM AGAINST KIRKPATRICK**
**(Eighth Amendment – Cruel and Unusual Punishment – Failure to Protect - pursuant to 42 U.S.C. § 1983)**

113.   Above paragraphs are stated herein by reference.

114.   The Eighth Amendment protects inmates against infliction of "cruel and unusual punishment."

115.   Plaintiff was in the care, custody, and supervision of the Defendant Kirkpatrick.

116.   Defendant Kirkpatrick had personal knowledge of the forewarned attack, yet acted with purposefulness, deliberate indifference, and malicious intent.

117.   The reckless or intentional subjecting of Plaintiff to physical assault is a sufficiently serious deprivation within the zone of Eighth Amendment protection.

118.   Defendant Kirkpatrick was deliberately indifferent to Plaintiff's health and safety.

119.   Defendant Kirkpatrick, through over seven letters written by Plaintiff, notice by the Acting Commissioner and several calls from Plaintiff's attorney, and supervisor at the Center for Appellate Litigation to Kirkpatrick's office, had actual knowledge of, appreciated, and ignored, the risks and dangers to Plaintiff's health and safety.  It

was made clear the numerous times Plaintiff's attorney had called and written to the facility.  It was also clear, since it was Kirkpatrick who ordered the 72 hour investigation where the facility should have been investigating Mr. Sparks' credible and documented allegations, but instead did not conduct any meaningful investigation.

120.   Despite having an appreciable opportunity to do so, Defendant Kirkpatrick took no meaningful action, (except for a 72 hour aforementioned keep lock- by the very officers threating Sparks), to abate the risk and danger to Plaintiff's health and safety.

121.   Defendant Kirkpatrick knowingly failed to implement a proper inmate classification system, and failed to properly classify Plaintiff, and when he was specifically put on notice of the threats to Plaintiff, he still chose to not place Plaintiff into protective custody, an easy, and routine placement.

122.   Plaintiff did not instigate or otherwise cause the violence that befell him.

123.   Defendant Kirkpatrick's actions and inactions were the direct and proximate cause of Plaintiff's injuries.

124.   As a direct and proximate cause of Defendant Kirkpatrick's actions, Plaintiff suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; and terror.


**THIRD CLAIM AGAINST  DEFENDANTS CLANCY, MARTIN, BARBER, STICKNEY, SNOW, DOE, AND HOLLAND**
**(First Amendment Retaliation)**

125.   Above paragraphs are stated herein by reference.

126.   The actions of the Defendants Clancy, Martin, Barber, Stickney, Snow, and
Holland were a violation of the First Amendment to the U.S. Constitution,
prohibiting retaliation for free expression of speech.

127.   The misconduct of the Defendants was under color of state law by state actors,
within the course and scope of their employment, making Defendants liable to Plaintiff under
42 U.S.C. 1983.

128.   The cover up of the force used by Defendants, the threats, inciting inmates to fight
Plaintiff, the placing of the weapon on Plaintiff, and the refusal of due process
considerations- including the placing of Mr. Sparks into solitary confinement, rather
than in protective custody- were all inflicted as retaliation for Mr. Spark's assertion
of his right to tell the truth about the threats made by Defendants, and also Mr.
Spark's due process rights and rights in accessing the courts.

129.   The threats and cover up used by Defendants chilled and restrained Plaintiff's
assertion of his right to tell the truth about the incident in incident reports, medical
records, and other document grievances for abuses by the Defendant officers and
others, and also for the due process hearing procedure regarding the underlying
incident, and in accessing the courts.

130.   As a direct and proximate result of the wrongful acts alleged above, Plaintiff
suffered bodily injury and resulting pain and suffering, disability, aggravation of an
existing condition, humiliation, and mental anguish, housing in an inappropriate area, an
inability to properly access the court, and violations of his due process rights regarding the
investigations into the underlying incident and this incident. These injuries and losses
are permanent and continuing, and Plaintiff will suffer such losses in the future.

**FOURTH CLAIM AGAINST CLANCY AND LECLAIR**
**(Conspiracy pursuant to 42 U.S.C. § 1985(2)-Obstructing Justice)**

131.   Above paragraphs are stated herein by reference.

132.   Defendants Corrections Officers Clancy and LeClair conspired with each other for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice.  Here, Defendants hid evidence, placing the weapon on Plaintiff, a criminal activity.

133.   None of these acts were in any way related to corporate policy or management decision, but were instead to further the criminal acts of Defendants.

134.   Defendant Corrections Officer Clancy, LeClair, Snow, and Stickney also further assisted in and affirmatively created the danger and ensuing deprivation of Plaintiffs' Equal Protection of the Law by inciting and allowing inmates to attack Plaintiff. Defendant Officers were conspiring and/or communicating that such actions directed towards Plaintiff would be acceptable, and that such actions by other inmates towards Plaintiff were implicitly condoned.

135.   Defendants cooperated together and hid their actions, and were not only creating and assisting in such a situation, but were deliberately indifferent to the rights of the Plaintiff to a degree that shocks the conscience.

136.    Defendants' obstruction of justice, knowledge of obstruction, in addition to their deliberate indifference, caused Plaintiff's injuries.

**FIFTH CLAIM AGAINST DEFENDANTS SNOW, STICKNEY, CLANCY**
**(Conspiracy pursuant to 42 U.S.C. § 1983)**

137.    Above paragraphs are stated herein by reference.

138.    Defendant Corrections Officers and their supervisors conspired with each other and with other inmates to threaten Mr. Sparks.  Never the less, Corrections Officers assisted in and affirmatively created the danger and ensuing deprivation of Plaintiffs' Equal Protection of the Laws by inciting, and allowing inmates to attack Mr. Sparks. Defendant Officers were conspiring and/or communicating that such actions directed towards plaintiffs would be acceptable, and that such actions by other inmates towards Plaintiff were implicitly condoned.

139.    Further, when the Defendants proceeded to attack Mr. Sparks, unlawfully charge him with a weapon, let the other inmates who did have the weapon and caused the injury to Mr. Sparks, get away, they were not only creating and assisting in such a situation, but were deliberately indifferent to the rights of the Plaintiffs in such a degree that shocks the conscience.

140.    The conspiring/knowledge of conspiring, assisting in and affirmatively creating the danger, in addition to the deliberate indifference, that shocks the conscious, of Plaintiff, and was the cause of the injuries suffered by Plaintiff.


**SIXTH CLAIM AGAINST KIRKPATRICK, HOLLAND, LECLAIR, DOES and SNOW**
**(Eighth Amendment – Supervisory Liability pursuant to 42 U.S.C. § 1983)**

141.    Above paragraphs are stated herein by reference.

142.    The Eighth Amendment protects inmates against infliction of "cruel and unusual punishment."

143.    A supervisor may be held liable for his/her actions that cause a constitutional injury.

144.   The supervisory Defendants Kirkpatrick, Holland, LeClair, Doe, and Snow, failed to properly train the subordinate Defendants regarding the responsibilities associated with their respective employment positions.

145.   The supervisory Defendants Kirkpatrick, Holland, LeClair, Doe, and Snow failed to properly supervise the subordinate Defendants to ensure that the subordinate Defendants were properly performing their employment duties.

146.   Defendant Holland and LeClair failed to supervise subordinate Officers Martin, Barber and Clancy when they were all engaged in beating up Mr. Sparks in the area including the Rotunda.

147.   The supervisory Defendants Kirkpatrick, Holland, LeClair, and Snow were legally responsible for the health and safety of inmates in Clinton Correctional Facility custody.

148.   Defendant Kirkpatrick was the final policy maker regarding decisions made as to placement of inmates, and their security at Clinton.

149.   Defendant Kirkpatrick represents official policy regarding the placement of inmates at Clinton.  Mr. Sparks should never have been placed at Clinton.

150.   The supervisory Defendants may not delegate the constitutional duties that they owed to Plaintiff to subordinate employees.

151.   The supervisory Defendant Kirkpatrick failed to implement a proper inmate classification system, and failed to properly classify Plaintiff.

152.   The supervisory Kirkpatrick, Holland, LeClair, and Snow ignored a long history of inmate abuses occurring within Elmira.

153.   Defendant Supervisor LeClair by hiding the evidence and unlawful actions of Defendants Clancy, Martin, Barber, and Holland in their use of force against Plaintiff, and then by lying in paperwork that the weapon was found on and admitted to by Plaintiff was sanctioning the behavior of Defendants and that they would encourage and would cover up additional uses of excessive force by other Officers.

154.   By their conduct in failing to remedy the wrongs committed by Clancy, Martin, Barber, and Holland and other employees of DOCCS under their supervision; in failing to properly train, supervise, or discipline Clancy, Martin, Barber, and Holland and other employees of DOCCS under their supervision; and in directing employees under their supervision, Defendant Officers acting under the color of state law and in their individual and official capacities and within the scope of their employment, caused damage and injury in violation of Plaintiff' rights guaranteed under 42 U.S.C. § 1983, and the United States Constitution, including its Eighth, and Fourteenth Amendments.

155.   As a result, the supervisory Defendants Kirkpatrick, Holland, LeClair, and Snow, actions and inactions were the direct cause of Plaintiff's injuries.

156.   As a direct and proximate cause of the Defendants' actions, Plaintiff suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; and terror.

## SEVENTH CLAIM AGAINST CLANCY and LECLAIR
### (14th Amendment- Right to be Free from Violations of Due Process of Law and Cover up Claim)

157.   Above paragraphs are stated herein by reference.

158.   In all of the reports of the incident, and all the subsequent hearings regarding the underlying inmate incident and in all of the papers produced, the photographs, they were all filled with the fabrications, cover up and lies perpetrated by Clancy and LeClair.

159.   There was ample evidence that showed that Mr. Sparks had been attacked by inmates with weapon, and not that he had the weapon.

160.   Evidence was fabricated and made up by Defendants Clancy and LeClair, including the moving of weapon, to create/fabricate/manufacture the cover up of one crime, and the commission of another.

161.   This cover up was performed by Defendants Clancy and LeClair in order to cover up Defendants' unlawful actions, and has now made it almost impossible for Plaintiff to litigate this underlying claim, because material evidence was destroyed that showed the weapon was on the inmates.

162.   In the incident reports, and all other paperwork, and hearings associated with the incident, all matters were filled with the same lies created by Defendants regarding the injuries to Plaintiff and they all tainted Plaintiff's disciplinary hearing regarding the inmate incident on October 2016.

163.   The tainting and manufacturing and hiding of evidence in such due process proceedings is abhorrent in our society, and shocks the conscience.

164.    A basic tenet of due process is the ability to confront notoriously unreliable evidence.

165.   Defendants knew their statements and actions were unlawful, contradictory and unbelievable.

166.  Despite this knowledge Plaintiff was not allowed to produce evidence of his position at the disciplinary hearings brought by the prison.

167.  Such conduct is deliberately indifferent and amounts to a violation of due process of law as guaranteed by the Fourteenth Amendment.

168.  The Defendants' many failures caused the injuries to Plaintiff.

169.  As a direct and proximate cause of the Defendants' actions, Plaintiff suffered emotional and physical torture, injury, and trauma, immense pain and suffering, humiliation, and terror.

**EIGHTH CLAIM AGAINST LECLAIR, CLANCY, LECLAIR, FSA FRENCH, and DOES**
**(14th Amendment- Right to be Free from Violations of Procedural Due Process of Law)**

170.  Above paragraphs are stated herein by reference.

171.   Mr. Sparks was found to have had a weapon on him against any logic or any actual process.

172.   There was no evidence that showed that Mr. Sparks had a weapon or used a weapon during the October 18, 2016 attack.

173.  Despite the fact that Mr. Sparks was cut, and the right finger of the  inmate who attacked Mr. Sparks showed signs that the inmate had the razor, Mr. Sparks was found to have had a weapon, against all reason and logic.

174.   There was no proper hearing or investigation conducted before the 450 days of solitary confinement were given to Plaintiff.

175.   There was absolutely no hearing or investigation given before Mr. Sparks was placed in solitary confinement even before the hearing concluded, immediately following his hospitalization from the October 2016 attacks.

176.   The absence of such due process safeguards is abhorrent in our society, and shocks the conscious.

177.   A basic tenant of due process is the ability to confront notoriously unreliable evidence.

178.   Defendants knew the statement of Defendant Clancy was contradictory and unbelievable.

179.   Defendants knew the statement of Defendant LeClair was contradictory and unbelievable.


180.   Despite this knowledge Plaintiff was not allowed to produce evidence of his position at the sham disciplinary hearing.

181.   Despite this knowledge Plaintiff's mail was censored, glass was found in his food, he was denied showers, he was given the wrong pills by Nurse Kimberly and other actions were taken to scare him, gaslight him, and to prevent him from introducing evidence, and to ensure he lose credibility.

182.   Such conduct is deliberately indifferent and amounts to a violation of procedural due process of law as guaranteed by the Fourteenth Amendment.

183.   Inmates in prison generally have access to recreation, visitation, use of the phone, mail, programming services such as group therapy and religious activities, and commissary.

184.    The placement of Mr. Sparks into solitary confinement, and the putting glass into his food, and denying him showers, among other things aforementioned things done to Mr. Sparks, was an atypical condition of confinement.

185.    When Plaintiff was placed into solitary confinement he was denied access to the normal programming services provided by the prison, including the program designed to help him with his mental health needs.

186.    While in solitary confinement Plaintiff was refused telephone calls, visitation, reasonable recreation, access to group therapy sessions and commissary.

187.    Plaintiff has a right to due process before he is subjected to a lengthy period in disciplinary segregation.

188.    As a direct and proximate cause of the Defendants' actions, Plaintiff suffered emotional and physical torture, injury, and trauma, immense pain and suffering, humiliation, and terror.

### NINTH CLAIM AGAINST KIRKPATRICK, DOES, AND KIM
### (Eighth Amendment – Deliberate Indifference to a Serious Medical Need, and Substantive Due process Violation)

190.    The above paragraphs are incorporated herein by reference.

191.    Defendants knew that Plaintiff was suffering from a serious medical condition to his obvious and observable injuries from being placed in Solitary Confinement without any due process.

192.    However, in an attempt to cover up their involvement, Defendants acted purposely and with malice and deliberate indifference to Plaintiff's obvious serious medical needs by not allowing him to see a doctor or other mental health professional and not obtaining

medical assistance/mental health services for him.  Nurse Kim, who was treating Mr. Sparks, further denied him medical assistance by dispensing the wrong medication, and then, unjustly accusing him of infraction.

193.    Defendant's deliberate indifference to Plaintiff's serious medical needs, caused Plaintiff to suffer in greater pain and physical damage and are therefore liable to Plaintiff under 42 U.S.C. Section 1983.

194.    Furthermore, Defendants were deliberately indifferent to Mr. Sparks mental health issues, and he did not receive the mental health treatment he needed while he was confined in SHU after the October 2016 incident.   Defendants' act or omission resulted in the denial of the minimal civilized measure of life's necessities, and Defendants had the sufficiently culpable state of mind of deliberate indifference to Mr. Spark's health and safety.

148.  By placing Plaintiff, an individual with a severe mental illness, classified as OMH 2, into solitary confinement, Defendants failed to accommodate Plaintiff's mental disability and denied him the benefits and services of the jail designed to accommodate his mental disability.

195.    Defendants are aware, or should be aware, that people who suffer from certain disorders and other serious mental illnesses, such as Mr. Sparks, are particularly vulnerable to the toxic effects of solitary confinement.

196.    There is agreement in the scientific community that solitary confinement increases the risk of causing serious mental injuries to people such as Plaintiff who suffer from certain mental health diagnoses.

197.    Due to Plaintiff's mental disability, placement in disciplinary segregation caused additional punishment not suffered by non-disabled prisoners.

198.    When Defendants put Plaintiff into solitary they failed to accommodate his mental disability and caused him to suffer additional mental injuries.

199.    This amounts to both discrimination and a failure to accommodate under the ADA.  Such actions by Defendants in placing Mr. Sparks into solitary confinement is conscious shocking and should never have been permitted in a democratic society.

200.    As a proximate and foreseeable result of Defendants' discriminatory acts and omissions Plaintiff suffered injuries including pain and suffering, emotional distress, and exacerbation of his mental illness.


## OCTOBER 2018 CLINTON INCIDENT CLAIMS


## TENTH CLAIM AGAINST DEFENDANTS STOTLER, HOLLAND, DOES, and BARBER
### Eighth Amendment, Cruel and Unusual Punishment (pursuant to 42 U.S.C. 1983 (Excessive Force)

201.    Above paragraphs are stated herein by reference.

202.    The actions of Defendants Stotler, Barber, and Holland in physically abusing Plaintiff violated the Eighth Amendment to the U.S. Constitution prohibiting cruel and unusual punishment.

203.    The misconduct of Defendants Stotler, Barber, and Holland was under color of state law by state actors, within the course and scope of their employment, making Defendants liable to Plaintiff under 42 U.S.C. § 1983.

204.    The force used by Defendants Stotler, Barber, and Holland was inflicted as intentional and gratuitous punishment, used for the purpose of punishing plaintiff,

and exceeded that which was reasonable and necessary under the circumstances, violated universally accepted standards of decency, and amounted to cruel and unusual punishment.

205.   The force used by Defendants Stotler, Barber, and Holland was malicious, sadistic with an intent to cause harm to Plaintiff.

206.   As a direct and proximate cause of Defendants Stotler, Barber, and Holland's actions, Plaintiff suffered emotional and physical torture, severe injury, and trauma; immense pain and suffering; humiliation; and terror.


### ELEVENTH CLAIM AGAINST HOLLAND and DOES
### (Eighth Amendment – Deliberate Indifference to a Serious Medical Need)

207.   The above paragraphs are incorporated herein by reference.

208.   Defendant Holland knew that Plaintiff was suffering from a serious medical condition to his obvious and observable injuries from the October 2018 assault.

209.   However, in an attempt to cover up their involvement Defendant Holland, and Does acted purposely and with malice and deliberate indifference to Plaintiff's obvious serious medical needs by not allowing him to see a doctor or other health professional and not obtaining medical assistance for him.

210.   Defendant's deliberate indifference to Plaintiff's serious medical needs, caused Plaintiff to suffer in greater pain and physical damage and are therefore liable to Plaintiff under 42 U.S.C. Section 1983.

211.   Plaintiff was physically and emotionally injured and has been damaged by Defendants' wrongful acts.

### TWELTH CLAIM AGAINST KIRKPATRICK, DOES, and HOLLAND

**(Eighth Amendment – Supervisory Liability pursuant to 42 U.S.C. § 1983)**

212.   Above paragraphs are stated herein by reference.

213.   The Eighth Amendment protects inmates against infliction of "cruel and unusual punishment."

214.   A supervisor may be held liable for his/her actions that cause a constitutional injury.

215.   The supervisory Defendants Kirkpatrick, Holland, and Does failed to properly train the subordinate Defendants regarding the responsibilities associated with their respective employment positions.

216.   The supervisory Defendants Kirkpatrick, Holland, and Does failed to properly supervise the subordinate Defendants to ensure that the subordinate Defendants were properly performing their employment duties.

217.   Defendant Kirkpatrick was the final policy maker regarding decisions made as to placement of inmates, and their security at Clinton.

218.   Defendant Kirkpatrick represents official policy regarding the placement of inmates at Elmira.

219.    The supervisory Defendants may not delegate the constitutional duties that they owed to Plaintiff to subordinate employees.

220.    The supervisory Defendant Kirkpatrick failed to implement a proper inmate classification system, and failed to properly classify Plaintiff.

221.    The supervisory Kirkpatrick, Does, and Holland ignored a long history of inmate abuses occurring within Elmira.

222.   By their conduct in failing to remedy the wrongs committed by employees of DOCCS under their supervision; in failing to properly train, supervise, or discipline Defendant Officers and other employees of DOCCS under their supervision; and in directing employees under their supervision, Defendant Officers acting under the color of state law and in their individual and official capacities and within the scope of their employment, caused damage and injury in violation of Plaintiff' rights guaranteed under 42 U.S.C. § 1983, and the United States Constitution, including its Eighth, and Fourteenth Amendments.

223.   As a result, the supervisory Defendants Kirkpatrick, Does, and Holland inactions were the direct cause of Plaintiff's injuries.

224.   As a direct and proximate cause of the Defendants' actions, Plaintiff suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; and terror.

**THIRTEENTH CLAIM AGAINST KIRKPATRICK and DOES**
**(Eighth Amendment – Cruel and Unusual Punishment – Failure to Protect -**
**pursuant to 42 U.S.C. § 1983)**

225.   Above paragraphs are stated herein by reference.

226.   The Eighth Amendment protects inmates against infliction of "cruel and unusual punishment."

227.   Plaintiff was in the care, custody, and supervision of the Defendants.

228.   Defendants had personal knowledge of the forewarned attack, yet acted with purposefulness, deliberate indifference, and malicious intent.

229.   The reckless or intentional subjecting of Plaintiff to physical assault is a sufficiently serious deprivation within the zone of Eighth Amendment protection.

230.   Defendants were deliberately indifferent to Plaintiff's health and safety.

231.   Defendants, through over seven letters written by Plaintiff, notice by the Acting Commissioner and several calls from Plaintiff's attorney, and supervisor at the Center for Appellate Litigation to Kirkpatrick's office, had actual knowledge of, appreciated, and ignored, the risks and dangers to Plaintiff's health and safety while he was in Clinton in 2016.  The placement of Mr. Sparks back at Clinton was unconstitutional.

232.   Despite having an appreciable opportunity to do so, Defendants took no action, to abate the risk and danger to Plaintiff's health and safety by returning him to Clinton.

233.   Defendants knowingly failed to implement a proper inmate classification system, and failed to properly classify Plaintiff, and when he was specifically put on notice of the threats to Plaintiff and the violence on him during his first Clinton incarceration, they still chose to not place Plaintiff into protective custody, an easy, and routine placement, or to make sure he would not be transferred to Clinton to begin with.

234.   Plaintiff did not instigate or otherwise cause the violence that befell him.

235.   Defendants' actions and inactions were the direct and proximate cause of Plaintiff's injuries.

236.   As a direct and proximate cause of Defendants' actions, Plaintiff suffered emotional and physical torture, injury, and trauma; immense pain and suffering; humiliation; and terror.


**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all the Defendants:

   a.   Compensatory damages in an amount to be determined at trial;

   b.   Punitive damages in an amount to be determined at trial;

   c.   Attorney's fees pursuant to 42 U.S.C. § 1988;

   d.   An award of Plaintiff' costs of suit;

   e.   Pre-judgment and post-judgment interest;

   f.   Such other relief as this Court deems just and proper.

Dated this 22nd day of June, 2020

Respectfully Submitted,

_____/s/_____
P. Jenny Marashi (PM0916)
Marashi Legal
930 Grand Concourse, #1E
Bronx, NY 10451
(917) 703-1742
Attorney for Plaintiff