**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

YUSUF SPARKS,

            Plaintiff,

       -v-                                    9:19-CV-1269 (AJB/MJK)

JASON HOLLAND, *et al.*,

            Defendants.
_____

**Hon. Anthony Brindisi, U.S. District Judge:**

<u>**DECISION and ORDER**</u>

## I.    INTRODUCTION

On October 15, 2019, Yusuf Sparks ("plaintiff") filed this action under 42 U.S.C. § 1983 alleging that more than two dozen named and unnamed prison officials violated his constitutional rights while he was incarcerated at Clinton Correctional Facility ("Clinton C.F."), a facility under the control of the New York Department of Corrections and Community Supervision ("DOCCS"). He amended his complaint first in December 2019, and then again—while incarcerated in a different facility on an unrelated matter—in June 2020. Plaintiff's claims focused on events that took place in October 2016 and October 2018.

In October 2016, a corrections officer responding to an altercation between plaintiff and two other inmates claimed to have found a weapon on plaintiff's person, which plaintiff claimed was planted. After receiving medical attention, plaintiff was the subject of two misbehavior reports. Plaintiff was found guilty at a hearing, which he complains was constitutionally inadequate, and subject to consequences including disciplinary confinement. While in

disciplinary confinement, plaintiff improperly received certain medication on one occasion. Although plaintiff was alerted to the error, he ingested the medication anyway. As a result, plaintiff received another misbehavior report.

The events of October 2018, which took place after plaintiff had been transferred away from, and then returned to, Clinton C.F., also arose from a purported altercation between plaintiff and two other inmates. Prison officials claimed plaintiff had punched his co-combatants and refused orders to stop fighting; plaintiff alleged, among other things, that he was subject to excessive force during the prison officials' response.

At all relevant times, Clinton C.F. had a three-step procedure for inmates to pursue grievances in the ordinary course, and pursuant to the Prison Litigation Reform Act ("PLRA") and DOCCS protocols, completing all three steps is required to "exhaust" complaints. Clinton C.F. inmates received training on how to use the procedure upon orientation, and further information was available on an ongoing basis, upon request, from multiple prison sources. Plaintiff has acknowledged the grievance procedure. Indeed, he has used it, including its appeals provisions, multiple times. But he did not do so in connection with either of the incidents complained of in his operative complaint.

Before the Court are defendants' motion for summary judgment and plaintiff's cross-motion for partial summary judgment. The motions have been fully briefed and will be decided based on the parties' submissions without oral argument.

## II.    BACKGROUND

Unless otherwise specified, the following facts are undisputed and derive from the parties' statements of material facts.  *See* Dkt. Nos. 91-1 (defendants' statement of material facts, "DSMF") & 100-1 (plaintiff's statement of material facts, "PSMF").[1]

From June to December 2016, and again beginning in October 2018, plaintiff was incarcerated at Clinton C.F., a DOCCS prison.  DSMF ¶¶ 1, 6, 57, 59.

Clinton C.F. offers inmates DOCCS's standard three-step grievance procedure to bring complaints about the facility, in the ordinary course, to officials' attention. *See* DSMF ¶¶ 67, 72. Detailed information about the grievance procedure is made available to Clinton C.F. inmates— including those confined in special housing units—in various formats, including through the law library and the grievance office, instruction during facility orientation, and upon request.  *See id.* ¶¶ 69–71.  In essence, the standard procedure entails submitting to the facility's inmate grievance resolution committee a written complaint within twenty-one days of an incident, appealing any adverse decision of the committee to the facility superintendent in writing within seven days, and appealing any adverse decision of the facility superintendent to the central office review committee in writing within seven days.  *See id.* ¶ 72.

Plaintiff acknowledges the grievance procedure.  *E.g.*, PSMF ¶¶ 67, 69, 77.  Indeed, it is undisputed that he utilized it, at least in part, on multiple occasions.  *See* Dkt. No. 91-3 ¶ 17 & Exh. B (indicating plaintiff filed and appealed three unrelated grievances, including two in 2014 and one in 2017); Dkt. No. 91-4 ¶ 14 (indicating plaintiff filed, but failed to appeal completely, a

---

[1] Where applicable, citations to the record correspond to CM/ECF pagination.

grievance related to this action). Nevertheless, plaintiff claims that he could not access the grievance procedure in connection with the events described below. *See* PSMF ¶¶ 67, 69, 77.

In April 2016, ahead of a potential facility transfer, plaintiff's former defense attorney wrote to the then-commissioner of DOCCS to express concerns about plaintiff's safety if he were to be moved to Clinton C.F. PSMF ¶ 5. Plaintiff was nevertheless transferred to Clinton C.F. and, based on his past conduct, placed in disciplinary confinement upon arrival. *Id.* ¶¶ 6, 8.

Throughout his early time at Clinton C.F., plaintiff and his former defense attorney repeatedly expressed concerns about his safety to, and sought protection from, officials at the facility. *See* PSMF ¶ 9; DSMF ¶¶ 9, 12. But, for reasons that the parties dispute, plaintiff repeatedly declined to be placed in protective custody after being released into the general population at Clinton C.F. *See* PSMF ¶ 13; DSMF ¶¶ 13, 14.

On October 18, 2016, plaintiff was involved in an altercation with two other inmates at Clinton C.F. DSMF ¶ 19. Defendant Clancy responded, handcuffed plaintiff, and performed a pat/frisk. *Id.* ¶¶ 20, 21. He found a weapon, which plaintiff maintains was planted, and thereafter took plaintiff to receive medical care. PSMF ¶¶ 21–23. Plaintiff eventually received further medical attention at a local hospital. DSMF ¶ 26.

Thereafter, based on the altercation and the weapon that Clancy claimed to have found in plaintiff's pocket afterwards, plaintiff was the subject of two misbehavior reports, charging him first with violating rules concerning weapon possession, smuggling, and possession of an altered item; and second with violating rules concerning violent conduct, creating a disturbance, fighting, and refusing a direct order. DSMF ¶¶ 27, 28.

Plaintiff received a hearing on the two misbehavior reports before defendant French. DSMF ¶ 29.  Before the hearing, which lasted multiple days, plaintiff was notified of the charges against him, and during the hearing he was provided with an assistant with whom he could, and did, consult.  *Id.* ¶¶ 30–32.  Although plaintiff was not permitted to have an attorney represent him during the hearing, he was allowed to, and did, consult with an attorney outside the hearing. *Id.* ¶¶ 34, 35.  During the hearing, plaintiff was given various DOCCS records, as well as the opportunity to question multiple witnesses, including corrections officials and the other inmates involved, although he did not ultimately question all of them.  *See id.* ¶¶ 37–39, 41.

At some point during the hearing, plaintiff complained of mental health-related issues, and the hearing was temporarily adjourned.  DSMF ¶ 44.  It resumed after the hearing officer took confidential testimony from the Office of Mental Health.  *Id.* ¶ 45.  When the hearing ultimately concluded, defendant French adjudicated plaintiff guilty of the charged rule violations. *Id.* ¶ 47.  As a result, plaintiff received 450 days of disciplinary confinement and lost various technology and recreation privileges.  *Id.* ¶ 48.

Afterwards, while plaintiff was in disciplinary confinement, defendant Kim gave him a medication that was not prescribed to him, an action defendants assert was inadvertent, and attempted to withdraw it.  DSMF ¶¶ 50, 51.  But, according to defendants, plaintiff attempted to maintain control over the medication by force and ultimately ingested it.  *Id.* ¶ 52.  Plaintiff largely disputes defendants' retelling of this event, but he admits to ingesting the improperly dispensed medication.  PSMF ¶¶ 50–52.  He thereafter received another misbehavior report charging him with violating rules concerning, among other things, unauthorized medication and interfering with an employee.  *Id.* ¶ 55.

Despite knowing of Clinton C.F.'s three-step grievance procedure outlined above, plaintiff did not pursue a formal grievance in connection with the October 2016 events. *See* DSMF ¶ 78; PSMF ¶ 78. Instead, he sought outside action from the Office of Special Investigation, claiming that he was unable to properly grieve those events. *See* PSMF ¶ 78.

In December 2016, plaintiff was transferred to a different DOCCS facility. DSMF ¶ 57. He was moved back to Clinton C.F. in October 2018. *Id.* ¶ 59.

Upon his return to Clinton C.F., on October 27, 2018, plaintiff was involved in another altercation with two other inmates, during which officials allege plaintiff punched the other inmates on their upper bodies and refused orders to stop fighting. *See* DSMF ¶¶ 60–62. Defendant Holland responded and used pepper spray to break up the fight. *Id.* ¶ 63.

Plaintiff was then brought to the Clinton C.F. hospital to receive medical attention, and staff observed that he sustained injuries during the fight. DSMF ¶¶ 64, 65. Afterwards, a non-party corrections official escorted plaintiff to keeplock. *Id.* ¶ 66.

On November 5, 2018, plaintiff filed a grievance which claimed that defendant Holland had slapped him in the face and included other information pertaining to the events of October 2016. DSMF ¶ 79. That grievance was assigned grievance number CL 74742-18. *Id.* ¶ 80. However, the then-superintendent of Clinton C.F. investigated and denied plaintiff's claims. *Id.* ¶ 81. Plaintiff never pursued the final step of the three-step process for this grievance, *i.e.*, appealing to the central office review committee. *Id.* ¶ 82.

Nevertheless, on October 15, 2019, plaintiff filed this action against various prison officials, including Holland, Snow, Martin, Clancy, Barber, Ducan, French, Kim, LeClair, Kirkpatrick, Stickney, Marlow, Stotler, and Does 1 through 20, alleging violations of his First,

Eighth, and Fourteenth Amendment rights under 42 U.S.C. § 1983.  Dkt. No. 1 ("Compl.").   The

thrust of the original complaint was that, during the October 2016 and October 2018 incidents,

the prison officials assaulted plaintiff, planted a weapon on him, deprived him of due process in

the resulting disciplinary proceedings, and failed to properly address his mental health concerns.

*Id.* at 2–3.  At the time of filing, plaintiff had been transferred from Clinton C.F., but remained

under DOCCS supervision while incarcerated at Sing Sing Correctional Facility.  *Id.* at 4.

Early litigation in this case was somewhat convoluted.  Although the Court will not

recount every development here, the highlights are as follows.  Plaintiff filed the first of two

amended complaints on December 26, 2019.  Dkt. No. 5.  The case was thereafter reassigned

from Magistrate Judge Christian F. Hummel to Magistrate Judge Andrew T. Baxter on January

28, 2020.  Dkt. No. 10.  Both before and after reassignment, defendants requested and received

multiple extensions for their response.  *See, e.g.*, Dkt. Nos. 8, 11, 16, 19–22.

In June 2020, defendants filed a motion to dismiss for failure to state a claim.  Dkt. No.

23.  Later the same month, before the parties received a ruling, plaintiff filed the second of two

amended complaints.  Dkt. No. 28 ("SAC").  Following additional extensions, *see* Dkt. Nos. 31

& 35, defendants filed an answer on September 30, 2020, Dkt. No. 36.

A long—and itself somewhat convoluted—discovery process followed.  *See, e.g.*, Dkt.

Nos. 38 (original case management plan, filed October 14, 2020), 48 (protective order regarding

the exchange of confidential materials, filed October 21, 2021), 56 (letter motion requesting

withdrawal of motion to compel, filed February 14, 2022), 64 (order resetting discovery

deadlines to June 30, 2023); 70 (same, to November 30, 2023).

On November 16, 2023, plaintiff was denied permission to further amend the complaint. Dkt. No. 77.  The case was then reassigned again, first from Magistrate Judge Baxter to Magistrate Judge Mitchell J. Katz, on January 5, 2024, Dkt. No. 80, and then from District Judge Mae A. D'Agostino to this Court on January 13, 2025, Dkt. No. 90.

On January 27, 2025, defendants moved for summary judgment.  Dkt. No. 91.  Plaintiff filed a cross-motion for partial summary judgment, as well as opposition papers, respectively, on March 11 and 12, 2025.  Dkt. Nos. 99 & 100.  On April 7, 2025, Defendants filed papers supporting their motion and opposing plaintiff's cross-motion.  Dkt. No. 105.  Plaintiff, in turn, opposed that submission on April 28, 2025.  Dkt. No. 106.

## III.    LEGAL STANDARD

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In assessing whether any genuine disputes of material fact remain, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

"Where, as here, the parties have cross-moved for summary judgment, a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *United States v. Bedi*, 453 F. Supp. 3d 563, 570 (N.D.N.Y. 2020) (cleaned up). "In undertaking this analysis, it bears noting that a district court is not required to grant judgment as a matter of law for one side or the other." *Id.*

## IV.    DISCUSSION

### A.    Exhaustion under the PLRA

The PLRA requires inmates to exhaust all available administrative remedies before suing prison officials in federal court. 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *Amador v. Andrews*, 665 F.3d 89, 96 (2d Cir. 2011) ("Exhaustion is mandatory—unexhausted claims may not be pursued in federal court.").[2]

---

[2] The Second Circuit has held that district courts can resolve the exhaustion issue without involving juries. *Messa v. Goord*, 652 F.3d 305, 308–10 (2d Cir. 2011) (per curiam). The Supreme Court recently narrowed the scope of this non-jury rule in cases—unlike this one—where the exhaustion issue is "intertwined with the merits" of a substantive claim. *Perttu v. Richards*, 605 U.S. 460, 464 (2025). In *Perttu*, the prisoner-plaintiff had filed a § 1983 action against a corrections official "for violating his constitutional rights, including his First Amendment right to file grievances," by interfering with his grievance forms and threatening physical violence if the plaintiff were to file additional forms. *Id.* The Supreme Court held that the Seventh Amendment guarantees the right to a jury trial on the exhaustion issue such cases, since "both [the exhaustion issues and the § 1983 First Amendment claim] depend[ed] on whether [the defendant] did in fact destroy [the plaintiff's] grievances and retaliate against him." *Id.* While *Perttu* alters the legal landscape, its precise impact is not yet understood, and some courts have already applied it narrowly. *See, e.g.*, *Hill v. Tisch*, 2025 WL 1871142, *8 (E.D.N.Y. July 7, 2025) (collecting cases). Here, though, plaintiff's claims do not directly relate to his ability to access Clinton C.F.'s grievance procedure, and the record establishes that he both was aware of, and in fact utilized (if incompletely), the procedure on multiple occasions. Thus, *Perttu* does not appear to apply to this case, and the Court proceeds with its analysis of exhaustion.

Exhaustion is required for essentially all manner of confinement-related claims. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.").

Prison systems decide what constitutes exhaustion within their facilities. *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements . . . that define the boundaries of proper exhaustion."); *Taylor v. N.Y. City Dep't of Corr.*, 849 F. App'x 5, 7 (2d Cir. 2021) (summary order). Therefore, DOCCS's internal procedures, which typically entail the three steps recounted in greater detail below, govern most inmate complaints in its facilities. 7 N.Y.C.C.R. § 701.5; *see also Bradshaw v. Piccolo*, 2025 WL 890415, *5 (W.D.N.Y. Mar. 24, 2025) (describing DOCCS's three-tiered process for typical inmate grievances).

Turning now to the parties' submissions, defendants argue that the PLRA precludes plaintiff's claims because he failed to exhaust the administrative remedies available to him as an inmate at Clinton C.F. *See* Def. Mem. at 10 ("Defendants are entitled to summary judgment because plaintiff failed to exhaust administrative remedies[.]" (capitalization omitted)).

In response, plaintiff offers an array of unavailing arguments, which the Court will address in turn. First, plaintiff claims, as he had been released from DOCCS custody before filing the operative complaint, the PLRA does not apply here. *See* Pl. Opp. at 18–19. Second, he argues that defendants forfeited the non-exhaustion defense by failing to plead it with appropriate specificity. *Id.* at 19–20. Third, he complains that the timing of defendants' non-exhaustion defense works undue prejudice on him. *Id.* at 20–22. Fourth, he contends that administrative remedies were unavailable to him as a matter of law. *Id.* at 22–24. And fifth, he maintains that he did exhaust administrative remedies by pursuing alternative relief. *Id.* at 24–26.

- 10 -

For the following reasons, plaintiff's efforts to sidestep the exhaustion requirement fail, defendants' motion must be granted, and plaintiff's cross-motion must be denied.

### i.      Applicability

Plaintiff tries to evade the exhaustion requirement entirely by arguing that the PLRA does not apply to his claims in this case, since he had been released from DOCCS custody when he filed the operative pleading, *i.e.*, the SAC.  *See* Pl. Opp. at 18–19.

In response, defendants argue that, first, plaintiff was in fact being held in pretrial confinement upon filing the SAC, Def. Reply at 6–7, and that, in any event, the time relevant to this analysis is when a plaintiff files an initial complaint, at which point plaintiff remained in DOCCS custody, not when a plaintiff files a subsequent pleading, *id.* at 7.

In support of plaintiff's argument, he leans primarily on *Sanchez v. Nassau County*, 662 F. Supp. 3d 369 (E.D.N.Y. 2023).  *See* Pl. Opp. at 10.  But that case does not aid him.

In *Sanchez*, the Eastern District of New York relied on *Jones v. Cuomo*, 2 F.4th 22, 26 (2d Cir. 2021) (holding that a psychiatric detainee was not a "prisoner" under the PLRA), discussed in greater below, to conclude that a plaintiff who had been released from custody by the time he filed the operative pleading was not a "prisoner" for PLRA purposes.  662 F. Supp. 3d at 393.

In broadening *Jones*, the *Sanchez* court drew heavily on extra-circuit authority while conceding that "[t]he Second Circuit has not yet decided . . . whether the PLRA's exhaustion requirement applies when a plaintiff was a prisoner at the time of the filing of the original complaint, but is no longer a prisoner when an amended complaint is filed."  *See* 662 F. Supp. 3d at 393–96.  But in surveying decisions closer to home, the court noted that "[t]he few courts in

[the Second] Circuit to address the issue have yielded opposite conclusions." *Id.* at 397 (collecting Eastern District cases).

As an initial matter, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 710 n.7 (2020) (quoting 18 J. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 134.02[1][d], 134–36 (3d ed. 2011) (quotations omitted)). Of the Northern District cases to acknowledge *Sanchez*, none have addressed—let alone agreed with—its extension of *Jones*; all three referred to it, in footnotes, for unrelated reasons. *See Morrell v. Sampson*, 2024 WL 4278647, *6 n.5 (N.D.N.Y. Sept. 24, 2024) (articulating failure-to-protect and failure-to-intervene standards); *Murray v. Cnty. of Albany*, 2025 WL 904515, *11 n.4 (N.D.N.Y. Mar. 25, 2025) (declining to reach qualified immunity where disputed facts remained on summary judgment motion); *Donald v. Leonard*, 2025 WL 2582802, *4 n.2 (N.D.N.Y. Sept. 8, 2025) (describing magistrate judge's citation in considering whether judge or jury should decide availability).

Regardless, and especially pertinent here, in *Sanchez* the Eastern District expressly found the defendants' citation to *Berry v. Kerik*, 366 F.3d 85 (2d Cir. 2004), unsuitable. 662 F. Supp. 3d at 401. In *Berry*, the plaintiff had filed an action concerning a since-completed term of custody under § 1983 while incarcerated on suspicion of committing new offenses. 336 F.3d at 86–87. Based on his returned-to-custody status, the Second Circuit held that the plaintiff was a "prisoner" for PLRA purposes. *Id.* Accordingly, in *Sanchez* the Eastern District held that *Berry* did not control precisely because the *Sanchez* plaintiff "was *not* incarcerated when he filed the operative . . . complaint." *Id.* (emphasis in original). The same is not true in this case.

Here, plaintiff was incarcerated upon filing both the original complaint and the operative pleading. *See, e.g.*, Dkt. Nos. 1 (complaint filed October 15, 2019) & PSMF ¶ 238 ("Mr. Sparks was released from DOCCS custody on December 19, 2019."); Dkt. Nos. 28 (SAC filed June 22, 2020) & 99-10 at 5 (referring to plaintiff's "more than two years in pretrial confinement," dating backwards from March 21, 2022).[3]  Accordingly, whatever one makes of *Sanchez*, it does not advance plaintiff's argument that the PLRA does not apply to his claims.

On the contrary, the precedent in our circuit establishes that the PLRA, and therefore the exhaustion requirement, applies, whether because plaintiff was incarcerated upon filing the original complaint or because plaintiff was incarcerated upon filing the operative pleading.

Consider *Jones v. Cuomo*, which the Eastern District broadened in *Sanchez*, 622 F. Supp. 3d at 393, but which defendants cite for its own holding, *see* Def. Reply at 6.  In *Jones*, the Second Circuit concluded that a plaintiff who brought an action under § 1983 while confined in a psychiatric facility pursuant to New York's Mental Hygiene Law was not a "prisoner" for PLRA purposes.  2 F.4th at 25.  The court relied on a prior panel's reading of the PLRA's text—which held that "[t]he natural reading . . . is that, to fall within the definition of 'prisoner,' the individual in question must be *currently detained as a result of* an accusation, conviction, or sentence for a

---

[3] The Court acknowledges plaintiff's argument, in his memorandum supporting his cross-motion for partial summary judgment, that defendants have "improperly assert[ed]" that plaintiff's papers prove his custodial status at the time of filing. Dkt. No. 106 at 4.  Plaintiff contends that including a copy of his state court appeal, *People v. Sparks*, 232 A.D.3d 168 (1st Dep't 2024), in his submissions does not establish whether he was in custody on June 22, 2020, since, according to plaintiff, "*Sparks* does not specify Plaintiff's custody status" on that date.  *Id.*  But considering the appellate court's explicit reference to plaintiff's status, appended to plaintiff's submission and quoted in part above, the Court finds plaintiff's argument entirely unpersuasive.  *See Sparks*, 232 A.D.3d at 171 ("On March 21, 2022, after more than two years in pretrial confinement, Mr. Sparks pleaded guilty to third degree robbery."); *accord* Dkt. No. 99-10 (exact same).  Although the Court is not generally in the business of performing complex calculations *sua sponte*, it is prepared to take judicial notice that, looking backwards from March 21, 2022, a greater-than-two-year period would encompass June 22, 2020, the SAC's filing date.  Thus, plaintiff has not established a genuine factual dispute about his custodial status when he filed the operative pleading.

criminal offense"—to distinguish the *Jones* plaintiff's status as a psychiatric detainee. *See id.* 25–26 (quoting *Gibson*, 692 F.3d at 202) (alterations in *Jones*)).

So, although the panel in *Jones* discussed the timing of a plaintiff's filing to the extent that it reflected his custodial status, the core of its analysis was to draw a line between "individuals detained pursuant to an accusation or conviction of a violation of a criminal statute," to whose claims the PLRA applies, and individuals in civil or psychiatric confinement, like the plaintiff there, to whose claims the PLRA does not apply. *Id.* at 25–26 (quoting *Jackson v. Johnson*, 475 F.3d 261, 267 (5th Cir. 2007) (alteration omitted)).

Here, plaintiff falls within the former category. Since he was serving a custodial sentence following conviction when he filed the original complaint, incarcerated pending a separate criminal trial when he filed the SAC, and at neither time in civil or psychiatric confinement, the authority supports defendants. *See* Def. Reply at 6–7 (citing, among other cases, *Jones*, 2 F.4th at 26). Thus, the PLRA and its exhaustion requirement apply to plaintiff's claims.

## ii.    Pleading Requirements

Next, plaintiff argues that the Court should not permit defendants to argue non-exhaustion because they failed to plead this affirmative defense with the requisite specificity. Pl. Opp. at 19–20.

As a general matter, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense[.]" FED. R. CIV. P. 8(c)(1). Non-exhaustion under the PLRA is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2017); *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). The Second Circuit has previously held that a defendant's

failure to raise and prove non-exhaustion waives the defense. *Villante v. VanDyke*, 93 F. App'x 307, 308 (2d Cir. 2004) (summary order).

While "the Second Circuit has not decided whether *Iqbal-Twombly*'s heightened pleading standard applies to affirmative defenses," the Northern District has in other cases "'require[d] defendants to include enough language to provide plaintiff[s] with "fair notice" of defenses, in line with the prevailing pleading standard in the Second Circuit[.]'" *United States v. Grimmel Indus., LLC*, 2018 WL 3730856, *2 (N.D.N.Y. Aug. 6, 2018) (quoting *Thornton v. Cnty. of Albany*, 2016 WL 5793714, *5 (N.D.N.Y. Oct. 4, 2016)). Thus, in their response, defendants must have put plaintiff on "fair notice" that they would argue that he failed to exhaust his administrative remedies under the PLRA.

Defendants did so here. In their answer, alongside other intended affirmative defenses, defendants included the following language: "To the extent [p]laintiff *failed to exhaust available administrative remedies*, the [SAC] is barred, at least in part." Dkt. No. 36 at 11 (emphasis added).[4] As defendants point out, Def. Reply at 9, the Second Circuit has held sufficient to raise exhaustion as an affirmative defense all-but-identical language in a responsive pleading, *Villante*, 93 F. App'x at 309 (holding an answer asserting that "[p]laintiff has failed to exhaust administrative remedies" adequately raised the defense and thus did not effectuate a waiver). Defendants' language therefore constitutes appropriate notice.

Plaintiff attempts to analogize *Thornton* to argue that defendants' answer was inadequate. *See* Pl. Opp. at 19–20. But this citation misses the mark. While the *Thornton* defendants also

---

[4] The Court further observes that, elsewhere in plaintiff's opposition to summary judgment, he cites this paragraph of defendants' answer in acknowledgment of the fact that "exhaustion was already listed" as an affirmative defense. Pl. Opp. at 21.

sought to argue non-exhaustion after failing to explicitly refer to the PLRA in their answer, the language held insufficient there, that "[p]laintiff's claims are barred by his failure to satisfy conditions precedent to suit," was far less specific than what defendants have included here.  *See* 2016 WL 5793714, at *5 (internal quotations omitted).  Further, by observing that the *Thornton* defendants in other cases "routinely raise[d] failure to comply with the PLRA *or failure to exhaust administrative remedies* as individual affirmative defenses," the court suggested that language directly mirroring defendants' here would have sufficed.[5]  *Id.* (emphasis added).

Against this backdrop, plaintiff's assertion that the answer is inadequate cannot succeed.  Defendants adequately notified plaintiff of their intention to argue non-exhaustion under the PLRA.  Accordingly, they did not waive this affirmative defense.

### iii.    Prejudice

Continuing down a similar path, plaintiff offers a variety of arguments seeking to bar defendants from arguing non-exhaustion for quasi-equitable reasons.  *See* Pl. Opp. at 20–21 (claiming, among other things, that defendants' counsel achieves dismissal of between fifty and sixty percent of unrelated inmate litigation due to "PLRA-related technicalities," and that, here, defendants' "fail[ure] to move on this affirmative defense for over 5 years" cost plaintiff "tens of thousands of dollars of litigation costs [and] over seven hundred hours of law firm time").

---

[5] This is to say nothing of the *Thornton* court's use of the disjunctive "or" to separate "failure to comply with the PLRA" and "failure to exhaust administrative remedies," which suggests that defendants need not explicitly invoke the PLRA to adequately notify plaintiffs of the non-exhaustion defense.  *See* 2016 WL 5793714, at *5.  In any event, as defendants highlight, Def. Reply at 9–10, their answer directly references the statute elsewhere, including just three paragraphs after the purportedly inadequate language, Dkt. No. 36 at 11–12 ("Pursuant to Section 807 of the Prison Litigation Reform Act of 1995, any compensatory damages to be awarded [p]laintiff herein shall be paid directly to satisfy any such outstanding orders until paid in full."); *cf.* Pl. Opp. at 20 ("Defendants here do not mention the PLRA in the exhaustion portion of their answer, or even cite the statute in their answer at all.").

While this section of plaintiff's briefing is no model of clarity, his contentions appear to boil down to the following: allowing defendants to pursue a non-exhaustion defense after the case has been pending for several years, and after discovery has concluded, would improperly prejudice him. *See generally* Pl. Opp. at 21. Indeed, citing defendants' purported reticence to develop discovery about exhaustion before plaintiff's deposition, plaintiff goes as far as to suggest that defendants "led [p]laintiff to believe . . . that [d]efendants were in agreement that the PLRA did not apply." *Id.*

But the Court cannot square these claims with plaintiff's own submissions. As detailed above, the Court has already concluded—and plaintiff seems to recognize, if counterintuitively— that defendants indeed raised non-exhaustion in their answer. *See* Dkt. No. 36 at 11 ("To the extent [p]laintiff failed to exhaust available administrative remedies, the [SAC] is barred, at least in part."); *accord* Pl. Opp. at 21 (noting "exhaustion was . . . listed" among other affirmative defenses in defendants' response to the operative pleading).

Regardless, as defendants highlight, Def. Reply at 10–11, plaintiff's request to strike this affirmative defense is untimely, *see* FED. R. CIV. P. 12(f). A court may strike a defense from an answer either on its own accord or on a motion served "within 21 days." *Id.* Defendants filed their answer on September 30, 2020, Dkt. 36, and plaintiff raised this issue for the first time far outside the three-week window, on March 12, 2025, *see* Pl. Opp. at 20–22.

Since plaintiff put forward this argument more than four years after defendants filed an answer, it is untimely under Rule 12(f)(2). And since it is difficult to grasp how plaintiff could be improperly prejudiced by a duly noticed non-exhaustion defense, the Court declines to use its power under Rule 12(f)(1) to strike, *sua sponte*, what is otherwise a properly raised defense.

- 17 -

iv.     **Administrative Remedies' Availability**

Moving on to the parties' substantive arguments under the PLRA, plaintiff contends that, if the PLRA does apply to his claims, administrative remedies were unavailable to him while he was incarcerated at Clinton C.F.  Pl. Opp. at 22.  To that end, plaintiff argues first that defendants have failed to establish that "a functional [grievance] process" existed at the relevant times and locations, and second that the standard grievance process at Clinton C.F. was unavailable to plaintiff due to his housing status and prison officials' intimidation.  *Id.* at 22–24.

Defendants dispute each point.  First, they argue that facts in the record, and specifically the declarations of Donna Wilcox and Rachael Seguin, establish "that there was a functioning grievance program at Clinton [C.F.] during the time that [p]laintiff was incarcerated there, and that this grievance program was available to all incarcerated individuals," including those, like plaintiff, incarcerated in the facility's special housing unit.  Def. Reply at 13.  And they stress that the PLRA applies to all incarcerated people, regardless of any claimed "special circumstances."  Def. Reply at 15 (quoting *Ross v. Blake*, 578 U.S. 632, 639 (2016)).

Second, defendants strenuously dispute that the grievance process was unavailable to plaintiff and point out that, as to at least the October 2018 incident, plaintiff appears to have abandoned such arguments.  Def. Reply at 16–18.

a.     **Existence of Administrative Remedies**

Even viewed in the light most favorable to plaintiff, the record establishes that there was a functioning grievance process at Clinton C.F.  In a sworn declaration, Seguin, the director of the incarcerated grievance program at DOCCS, outlined the grievance process at Clinton C.F. and other DOCCS sites.  *See generally* Dkt. No. 91-3 ("Seguin Decl.").  Seguin described a

three-step process in which, first, inmates "must file a complaint with [the inmate grievance resolution committee] within [twenty-one] calendar days of an alleged incident at the individual facility where the incarcerated individual is housed," after which the committee has sixteen calendar days to respond; second, inmates "may appeal [a committee recommendation] to the [s]uperintendent of the facility within [seven] days after receipt," after which the superintendent has twenty calendar days to respond; and third, inmates "may appeal the [superintendent's] decision to [the central office review committee] within [seven] calendar days after receipt." Seguin Decl. ¶ 7.

All submissions must be in writing and submitted in the first instance to the inmate grievance resolution committee at the facility where the grieving inmate is housed. *See* Seguin Decl. ¶ 7. Separate, expedited procedures are made available for complaints regarding "harassment or misconduct by DOCCS employees." *Id.* ¶ 9.

Wilcox's sworn declaration largely repeats the same information. *See generally* Dkt. No. 91-4 ("Wilcox Decl."). Wilcox was the incarcerated grievance program supervisor at Clinton C.F. upon giving her declaration. *Id.* ¶ 1. In her declaration, she outlined precisely the same three-step grievance procedure as Seguin. *See id.* ¶¶ 7–10.

A review of the available record confirms that plaintiff does not actually challenge the existence of this process at Clinton C.F. during the relevant period. Instead, he contends that it was unavailable to him. *See, e.g.*, PSMF ¶¶ 67 (denying the claim that "[t]here is a fully functioning grievance procedure available to inmates at Clinton [C.F.]," apparently because "[p]laintiff was *unable to access it*" (emphasis added)); 69 (denying the claim that "[t]he written policies and procedures concerning the [incarcerated grievance program] are widely distributed and readily accessible to incarcerated individuals," due to a dispute over "accessibility in SHU

and under mental distress"); 70 ("assert[ing] SHU confinement and mental state effectively barred access" to the DOCCS directive outlining grievance procedure at Clinton C.F.); 71 (conceding that plaintiff received training on utilizing Clinton C.F.'s grievance procedure but "disput[ing] effective instruction given [plaintiff's] SHU status and coercion").

Setting aside for now arguments about availability, plaintiff does not meaningfully contest, and therefore has not created a genuine dispute regarding, the fact that the three-step grievance process at Clinton C.F. existed. Indeed, he concedes his awareness of it. *See, e.g.*, PSMF ¶ 77 ("*admit[ing] familiarity [with the grievance process] but den[ying] ability to freely use it* due to coercion and confinement" (emphasis added)).[6]

Thus, an administrative remedy entailing the three-step procedure that Seguin and Wilcox outlined was in place at Clinton C.F., and plaintiff was aware of it. Seguin Decl. ¶ 18; Wilcox Decl. ¶¶ 7–10; PSMF ¶ 77. The record reveals no genuine, material disputes about these facts.

### b.    Availability

The next question is whether the three-step grievance process was available to plaintiff. For the reasons given below, both the available record, even viewed in the light most favorable to plaintiff, and the law in the Second Circuit establish that it was.

Broadly speaking, the Supreme Court has recognized three exceptions to the exhaustion requirement, all of which focus on the "availab[ility] of administrative remedies." *Ross*, 578 U.S. at 642. An inmate's failure to exhaust may be excused when: (1) the applicable grievance

---

[6] On the other hand, in plaintiff's statement of material facts, he repeatedly declines to admit or deny defendants' descriptions of the three-step grievance process on account of his "lack[ing] independent knowledge of DOCCS grievance procedures," *e.g.,* PSMF ¶¶ 68 (concerning DOCCS Policy Directive No. 4040), 72 (concerning N.Y.C.R.R. § 701.5), 73 & 74 (concerning expedited procedure for grievances concerning harassment). By their own terms, however, these responses are not denials. And, particularly when considered alongside plaintiff's admitted familiarity with the grievance process, they do not create genuine, material factual disputes.

procedures "operat[e] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) the procedures "[are] so opaque that [they] become[], practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *See id.* at 643–44.

Availability is "an objective [test]: that is, would a similarly situated individual of ordinary firmness have deemed [administrative remedies] available." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 311–12 (2d Cir. 2020) (citation omitted).

### 1.    Opacity

Here, the parties' arguments primarily concern *Ross*'s exception for undue opacity, so the Court first considers whether the grievance process was "so opaque" as to be essentially useless. 578 U.S. at 642; *see* Pl. Opp. at 24 & Def. Reply at 16.  It was not.

Plaintiff leans on *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016), to support his claim that, because he was housed in Clinton C.F.'s special housing unit following the October 2016 incident, the facility's three-step grievance process was unavailable to him.  Pl. Opp. at 24.  But that case does not stand for the proposition that inmates in special housing units generally face unduly opaque grievance procedures.  In *Priatno*, the panel evaluated procedures which provided that inmates in special housing units could file grievances by giving complaints to corrections officers, who were then supposed to forward the complaints to grievance clerks, but which were silent about what inmates were to do if corrections officers never forwarded their complaints to grievance clerks.  829 F.3d at 124.  The panel ultimately concluded that those procedures—not *all* procedures involving special housing units—were too opaque and thus unavailable.  *Id.*

But, as detailed above, the record shows that the procedures in *Priatno* were not the procedures in place at Clinton C.F.  Indeed, Clinton C.F. made available, and plaintiff was aware of, a three-step grievance procedure in which inmates, including those in the special housing unit, were to first submit complaints directly to the inmate grievance resolution committee within twenty-one days, appeal adverse decisions within seven days to the facility's superintendent, and finally appeal any further adverse decisions within seven days to the central office review committee.  *See* Seguin Decl. ¶ 7, Wilcox Decl. ¶¶ 7–10; PSMF ¶ 77.  Even crediting all of plaintiff's factual contentions, these procedures cannot be considered unduly opaque under *Ross* or *Priatno*, notwithstanding plaintiff's special-housing-unit status.[7]

More damaging still to plaintiff's arguments about unavailability, the Second Circuit has held that an inmate's prior use, or even mere knowledge, of a grievance procedure is evidence that it is "available."  *See Hall v. Annucci*, 2023 WL 7212156, *2 (2d Cir. Nov. 2, 2023) (summary order) (concluding that an inmate's having "previously used [procedure] to file several grievances" indicated procedure "was not a dead end nor too opaque for an ordinary prisoner to navigate"); *Taylor v. N.Y. City Dep't of Corr.*, 849 F. App'x 5, 8 (2d Cir. 2021) (summary order) (holding testimony showing inmate "was familiar with [administrative] procedures," but "just chose not to follow them," did not render procedures unavailable).

Here, the record establishes that plaintiff knew about Clinton C.F.'s three-step procedure. In her declaration, Seguin stated that she aware that this action involved two incidents, one in

---

[7] For example, plaintiff testified that inmates in Clinton C.F.'s special housing unit were to file grievances through officers who picked up inmates' mail.  PSMF ¶ 87.  According to plaintiff, the officers would then share the grievances among themselves, and as a result officers would threaten the grieving inmates.  *See id.* ¶¶ 84–85. Plaintiff further testified, "I don't think it made it to the superintendent because of the interception that was going on in between the hands of the grievance was going to, I sent grievances outside of their facility."  *Id.* ¶ 86.  But accepting these claims does not create a factual dispute about the following key facts: plaintiff was aware of Clinton C.F.'s grievance procedure, he utilized it at least in part (*i.e.*, by submitting a grievance in the first instance, before being threatened), and he pursued alternative remedies (*i.e.*, by "send[ing] grievances outside of their facility").

October 2016 and one in October 2018, involving plaintiff when he was housed at Clinton C.F. Seguin Decl. ¶ 13.  After describing the incidents as she understood them, Seguin stated that they "are the proper subject for a grievance under DOCCS grievance procedures" as described above. *Id.* ¶ 14.  A records check Seguin performed showed that plaintiff never appealed any grievances related to the claims at issue in this case, as exhaustion would have required.  *Id.* ¶ 17.  But he did appeal two grievances filed in December 2014, before his claims in this case arose, and a third in 2017, which was also unrelated.  *Id.*; *see also* Seguin Decl., Exh. B.

Like Seguin, Wilcox also ran a records check for plaintiff's grievances.  Wilcox Decl. ¶ 14.  She found just one grievance pertaining to this action, submitted in November 2018, which plaintiff had failed to pursue through the entire three-step process, including both appeals.  *Id.* ¶¶ 15–19 (noting, among other things, that "[f]ollowing an investigation, this grievance was denied and [p]laintiff did not pursue further appeal to [the central office review committee]").

Beyond plaintiff's previous and incomplete uses of the procedure, Wilcox further noted that the New York code sections spelling out the three-step grievance procedure at Clinton C.F. were available to all inmates, including those in the special housing unit, through the facility's law library.  *Id.* ¶¶ 4, 5.  And Wilcox stated that all incarcerated individuals at Clinton C.F. receive trainings on "the process for filing and appealing grievances" at the facility.  *Id.* ¶ 6.

Furthermore, as discussed above, plaintiff has admitted to being aware of the procedure, even as he contests that he should have been required to pursue it to completion.  Yet as a legal matter, plaintiff has conceded both existence and availability:

> **Defendants' Statement:** [Plaintiff] did not file any grievances related to the incidents that occurred in October 2016 and did not appeal any such grievances to [the central office review committee].

> **Plaintiff's Response:** *Admitted in part*, denied in part. *In fact, he filed an OSI investigation*, alerting officials that he was unable to get his grievances in.
>
> **Defendants' Statement:** Plaintiff filed a grievance on November 5, 2018, alleging that Defendant Holland slapped him in the face and making various other allegations that are at issue in this litigation, including allegations related to what transpired in October 2016.
>
> **Plaintiff's Response:** *Admitted*.
>
> . . .
>
> **Defendants' Statement:** This grievance was investigated by non-party then-Superintendent Earl Bell and denied.
>
> **Plaintiff's Response:** *Admitted*.
>
> **Defendants' Statement:** Plaintiff did not appeal this grievance to [the central office review committee].
>
> **Plaintiff's Response:** Admitted in part, denied in part. *Plaintiff admits to not appealing to [the central office review committee]*, but denies this bars his claims.

PSMF ¶¶ 78, 79, 81, 82 (emphases added, citations to record omitted).

The record therefore shows that the three-step grievance procedure at Clinton C.F. was not only clear enough to use, but also that plaintiff was aware of it, that he had utilized it in prior and unrelated instances, and that he did not pursue all three steps in complaints related to this action. While different circumstances certainly could have supported a different conclusion, plaintiff has failed to identify any facts in the record that would do so here. Accordingly, the procedure was not unavailable under the exception for opacity.

### 2.    "Machination, Misrepresentation, or Intimidation"

Plaintiff also gestures toward *Ross*'s third exception, unavailability due to "machination, misrepresentation, or intimidation," 578 U.S. at 644, arguing that "staff intimidation" constituted "'machination' and 'intimidation' [which] thwart[ed] access" to the grievance procedure at

Clinton C.F., Pl. Opp. at 24. But even taking as true all of plaintiff's factual contentions on this issue, this argument fails as a matter of law.

The Second Circuit has indeed suggested that "fears related to threats or intimidation [from prison officials] in connection with the grievance process itself" may render an administrative remedy unavailable. *Lucente*, 980 F.3d at 312. Accordingly, in some scenarios, "knowledge of threats or violence . . . by prison officials could plausibly constitute intimidation that would satisfy the objective standard where that conduct was based upon a grievance or complaint . . . or could reasonably be viewed . . . as an attempt to silence that inmate or others." *Id.* at 313. But whether such circumstances were present here is beyond genuine factual dispute.

That is because, even if plaintiff were subject to such intimidation, the parties do not dispute that it did not deter plaintiff from *initiating* the grievance process. For example, plaintiff noted that confinement in the special housing unit after the October 2016 incident, combined with his claim that "[Clinton C.F.] staff '[would not] let [plaintiff] put in grievances'" together constituted "physical and procedural barriers to accessing the grievance process at Clinton [C.F.]." PSMF ¶ 113. But in the very next paragraph, plaintiff admitted to "'putting [in] complaints'" and "'fil[ing] a grievance and claim'" around the same time, and then—not before, but after doing so—receiving threats from prison staff. *Id.* ¶ 114. Accordingly, the record does not establish a dispute of fact over whether prison officials' conduct deterred plaintiff or rendered the grievance process unavailable to him in connection with the relevant events.

Additionally, as detailed above, plaintiff elsewhere admitted that he declined to pursue the three-step grievance process whatsoever for the October 2016 incident, electing to pursue an outside remedy from the Office of Special Investigations instead, and that he started, but did not

complete, the three-step grievance process in connection with the November 2018 incident. PSMF ¶¶ 78, 79, 81, 82.

As to the former incident, while the Second Circuit has held that some "concurrent administrative investigation[s]" may bar submission of a grievance, merely electing to pursue a different remedy, for example by complaining to the Inspector General's Office, generally will not render a remedy unavailable. *Kearney v. Gebo*, 713 F. App'x 39, 42 (2d Cir. 2017) (summary order).[8] And as to the latter, without a nonconclusory factual basis on which to conclude otherwise, completing the first step establishes that the grievance process was available to plaintiff. *See Hall*, 2023 WL 7212156, at *2. Therefore, the record does not indicate that the administrative remedies at Clinton C.F. were unavailable to plaintiff due to prison officials' "machination, misrepresentation, or intimidation."

**v.      Exhaustion**

For completeness's sake, the Court considers separately whether plaintiff exhausted the administrative remedies available to him at Clinton C.F. As suggested elsewhere in this order, the record plainly shows that he did not, and no genuine, material dispute exists as to this fact.

For his part, plaintiff argues that he "exhausted available remedies *through OSI*," apparently referring to a separate process through the Office of Special Investigations. Pl. Opp. at 24 (emphasis added, capitalization omitted). But pursuing outside or otherwise alternative remedies, particularly when prisons' remedies are available, does not satisfy the PLRA.

---

[8] Defendants appropriately cite *Kearney*, among other cases, in observing that "[i]t is well settled that an incarcerated individual must use the established grievance process and cannot exhaust his administrative remedies by other processes." Def. Reply at 19.

*Kearney*, 713 F. App'x at 42 (holding pursuing outside remedies is generally not exhaustion); *Jones*, 549 U.S. at 218 (holding prison systems determine what constitutes exhaustion).

In this legal context, plaintiff's own version of events essentially closes the door on his exhaustion argument. *See* PSMF ¶¶ 78 (admitting to pursuing an Office of Special Investigations remedy instead of filing grievances at Clinton C.F.), 79 (admitting to filing a grievance pertaining to the October 2016 incident), 81 (admitting the Clinton C.F. superintendent denied relief as to the same grievance), 82 (admitting to failing to appeal the Clinton C.F. superintendent's denial of the same grievance to the central office review committee).

In summary, the record shows that plaintiff did not exhaust his administrative remedies.

**B.    Remaining Arguments and Defenses**

Beyond their disagreements concerning the PLRA, the parties offer a litany of arguments and defenses about the substantive claims in this case. *See generally* Pl. Opp.; Def. Reply; Pl. Reply. But, when applicable, the PLRA bars any non-exhausted claims from federal court. 42 U.S.C. § 1997e(a); *see Amador*, 665 F.3d at 96. Thus, the Court need not reach these arguments.

Further, plaintiff has expressly abandoned his Eighth Amendment excessive force claims against Stotler and Barber pertaining to the 2018 incident; as well as his Eighth Amendment deliberate indifference claim against Holland. Pl. Opp. at 40 ("Plaintiff concedes to dismissing claims against Stotler and Barber for the 2018 excessive force incident."; "Plaintiff concedes to dismissing [the Eighth Amendment deliberate indifference] claim against Defendant Holland.").

For the remaining claims, however, a § 1983 action is unavailable to plaintiff in this case.

**V.    CONCLUSION**

As to the remaining claims in this case, even accepting plaintiff's nonconclusory version of the salient events as true and drawing all reasonable inferences in his favor, no rational juror could find that a reasonable person in plaintiff's position would have believed the administrative remedies at Clinton C.F. unavailable.  Therefore, plaintiff cannot pursue such claims in a § 1983 action against prison officials.  Accordingly, defendants' motion for summary judgment must be granted, and plaintiff's cross-motion for summary judgment must be denied.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment (Dkt. No. 91) is GRANTED;

2.  Plaintiff's cross-motion for summary judgment (Dkt. No. 99) is DENIED; and

3.  Plaintiff's operative complaint (Dkt. No. 28) is DISMISSED.

The Clerk of the Court is directed to terminate the pending motion, enter a judgment accordingly, and close the file.

**IT IS SO ORDERED.**

Dated: September 30, 2025
Utica, New York.

Anthony J. Brindisi
U.S. District Judge